# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-1508V**

MARY ANN O'DONNELL,

Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

Respondent.

Chief Special Master Corcoran

Filed: November 20, 2023

*Emily Beth Ashe, Anapol Weiss, Philadelphia, PA, for Petitioner.*

*Steven Santayana, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION ON DAMAGES[1]

On June 24, 2021, Mary Ann O'Donnell filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Respondent conceded that Petitioner had suffered Guillain Barré syndrome ("GBS") after receipt of an influenza ("flu") vaccine administered on October 1, 2019, as listed on the Vaccine Injury Table. However, the parties reached an impasse on the appropriate award for pain and suffering from that injury, leaving that issue to my resolution. For the reasons set forth below, I find that Petitioner is entitled to **$190,000.00 (representing actual pain and suffering).**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I. Relevant Procedural History

After initiating her claim, Petitioner filed the statutorily-required affidavit and medical records (Exs. 1 – 24). In December 2022, Respondent conceded entitlement and. Rule 4(c) (ECF No. 41); Entitlement Ruling (ECF No. 42). After the parties reached an damages impasse, they filed simultaneous briefing. Respondent's Brief (ECF No. 51); Petitioner's Brief (ECF No. 53), *see also* Ex. 25 (Damages Affidavit); Respondent's Response (ECF No. 55); Petitioner's Response (ECF No. 56). As of August 2, 2023, the matter is ripe for adjudication.

## II. Authority

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)). I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case.").

And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters)[3] adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

## III. Relevant Medical History

I have reviewed both parties' arguments and all submitted evidence. I find the following to be most relevant to the damages determination. Citations are primarily to the medical records; footnotes contain information from Petitioner's April 2023 affidavit.

Petitioner was born in 1940, and thus was 79 years old upon her vaccination and her GBS onset in 2019. Her medical history[4] included anemia, chronic obstructive pulmonary disease ("COPD"), intermittent fatigue, and chronic pain and numbness in her

---

[3] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[4] In presenting his damages position, Respondent asserts that the preexisting medical conditions were "extensive," Resp. Brief at 8, but without elaborating on their significance. And some aspects of the noted history, such as a "total abdominal hysterectomy and bilateral salpingo-oophorectomy" (the latter meaning the removal of the ovaries and fallopian tubes) are clearly irrelevant here.

In contrast, Petitioner states that while she had "a documented medical history, none of her diagnosis prior to GBS caused her any physical limitations." Pet. Brief at n. 1 (lacking citation to *pre-vaccination* medical records); *see also* Ex. 25 at § 19 (April 29, 2023, recollections of her condition prior to the October 1, 2019, vaccination).

feet. *See generally* Ex. 2 (primary care); Ex. 15 (podiatry, and September 2018 EMG/NCV studies yielding unremarkable findings). Her left elbow was surgically replaced in September 2018, with an apparently good recovery until a subsequent fall, prompting a new prescription of hydrocodone-acetaminophen (Norco) in August 2019. Ex. 14 (orthopedics and physical therapy ("PT")); Ex. 2 at 30, 60.

Petitioner characterized her pre-GBS baseline as "a maniac running around." Ex. 3 at 351. She was "an active hairdresser and involved in community clubs." *Id.* at 484. Despite unrelated chronic numbness in her feet, she was "able to perform activities of normal living." *Id.* at 497. She was a widow living alone with family nearby. Ex. 3 at 638.

On October 1, 2019, Petitioner received the subject flu vaccine at a pharmacy. Ex. 1. Fourteen (14) days later, on October 15th, her podiatrist recorded a follow-up appointment with no new complaints and an unremarkable physical exam, but a new prescription for hydrocodone-acetaminophen. *Compare* Ex. 15 at 3-4, 6-7.

Also on October 15th, however, Petitioner's primary care physician ("PCP") recorded that Petitioner had reported a one-day history of left leg numbness and weakness, with difficulty walking. Ex. 2 at 34. The PCP's physical exam found decreased sensation and mild weakness. *Id.* While noting that the *podiatrist* thought Petitioner's symptoms were related to her lower back, the PCP deferred any specific diagnosis and recommended an EMG of the left leg. *Id.* at 35. The PCP told Petitioner to walk with a cane and seek treatment if her symptoms worsened. *Id.*

On October 16, 2019, family members brought Petitioner to the Gottlieb Memorial Hospital emergency room in Melrose Park, Illinois. Ex. 3 at 281. She complained of numbness, weakness, and decreased sensation in both legs, plus abdominal and back pain, nausea, and vomiting. *Id.* at 281, 284. She underwent an EKG; ultrasound; CT scans of the thoracic and lumbar spine, and MRIs of the thoracic spine and brain. *Id.* at 285-92, 301-02. By October 17th, the neurology team proposed transverse myelitis versus a sensory neuropathy as potential diagnoses. *Id.* at 301. After receiving high-dose steroids (Solumedrol) for two days, Petitioner was deemed to be "stabilized" and thus switched to a prednisone taper. *Id.* at 320.

However, Petitioner continued to have symptoms including "sharp pain from her neck down to the feet with some tingling"; she was given hydrocodone-acetaminophen and later gabapentin (Neurontin). Ex. 3 at 322, 347. Her PCP and the neurology team continued to consider – but never obtained – an EMG. *See, e.g.*, *id.* at 301, 319, 323, 332, 333. But in light of Petitioner's ongoing "tingling episodes," on October 24th, she underwent an MRI of the cervical spine which visualized multiple levels of canal and

neural foraminal stenosis with cord deformity, but without definite cord signal abnormality. *Id.* at 323, 336, 346. The neurology team noted Petitioner's "unusual presentation" and their "uncertain[ty] if this finding in the cervical spine is the source of her complaints." Ex. 3 at 347. They also considered "a non-structural source of her symptoms," specifically GBS – but that would require further workup including a lumbar puncture and cerebrospinal fluid ("CSF") analysis. Ex. 3 at 351-53; *see also id.* at 369.

"After much discussion with neurosurgery, neurology, and [her PCP], it was decided that [Petitioner] may be improved with surgery," Ex. 3 at 410, specifically a cervical discectomy and fusion at C3-4 and C4-5 performed on October 29th, *id.* at 377-79.[5] But her condition did not improve – she had continued foot pain, neck pain, tingling and numbness in her arms and hands, tingling and weakness in her legs, and difficulty walking. *Id.* at 380-408. She also developed difficulty swallowing. *Id.* at 409. She was "frustrated" and requested a lumbar puncture, but that "[would not] be helpful so soon after surgery." *Id.* at 397, 403, 404. A neurologist also recommended IVIg. *Id.* at 409.

On November 3, 2019, due to Petitioner's worsening neurological condition, she was transferred from Gottlieb to Loyola University Medical Center ("LUMC") in Maywood, Illinois. Ex. 3 at 410-11.[6] On November 4th, she was recommended to undergo speech therapy in light of her dysphagia. Ex. 21 at 32. She also underwent a lumbar puncture for CSF analysis, which was unremarkable. Ex. 3 at 454-55, 463.

November 6th EMG/NCV study findings were consistent with an "asymmetric sensorimotor polyneuropathy with prominent demyelinative characteristics," specifically the AIDP subtype of GBS. Ex. 21 at 4.[7] Between November 6th – 15th, Petitioner received five plasmapheresis sessions – which delivered "good improvement in swallowing [function and] arm weakness, [but] less improvement in her legs." Ex. 3 at 584, 627.[8] But she still had decreased sensation in her hands and feet bilaterally. *Id.* at 629. Her motor strength was 5/5 in both arms and legs, but she required assistance and a walker to ambulate. *Id.* A neurologist noted her history of "flu shot 14 days prior to onset of

[5] In her April 2023 damages affidavit, Petitioner recalls that she "was required to sign a release acknowledging that the surgery could result in death[,] caus[ing her] significant emotional distress." Ex. 25 at ¶ 7.

[6] Petitioner was "frustrated and disappointed that the doctors were sending [her] to a different facility; it felt like they gave up on [her]." Ex. 25 at ¶ 8.

[7] The EMG/NCV studies were delayed at least in part due to "limited schedule availability." Ex. 3 at 458, 460, 464.

[8] Petitioner recalls that the plasmapheresis sessions "took an entire day to complete during which I watched blood be drained from [her] body, cleaned, and returned to [her]. It felt surreal [.]" Ex. 25 at ¶ 9.

symptoms," *Id.* at 550, and her PCP later advised "not to take flu shots a[s] this may have been what caused [her GBS]." *Id.* at 801-02.

On November 20, 2019, Petitioner was transferred from LUMC to an in-patient rehabilitation center where she underwent physical therapy ("PT"), occupational therapy ("OT"), and speech therapy. Ex. 3 at 584, 641-802.[9] She was also assessed with mild depression, for which she opted to see a psychologist "for adjustment and coping to disability," instead of starting prescription medication. *Id.* at 634, 641. Towards the end of the rehab course, the PCP recorded that Petitioner felt "nearly back to her baseline," and could walk unassisted. *Id.* at 798.[10] However, the therapy specialists provided more detail – characterizing Petitioner as independent with modifications, such as holding onto furniture while moving from a chair to her bed, and seated bathing. *Id.* at 807. Her grandson and daughter received "family training" in anticipation of Petitioner's discharge home. *Id.* at 791. Upon her December 11, 2019, discharge, Petitioner was noted as still taking hydrocodone-acetaminophen and gabapentin. *Id.* at 809-10.[11]

From mid-December 2019 to early February 2020, Petitioner completed 11 PT sessions, 10 OT sessions, and 6 skilled nursing appointments. *See generally* Ex. 4. This care occurred at her home, due to her "poor endurance and generalized weakness." *Id.* at 689. The providers addressed unsteady gait, strength training, techniques in how to conserve energy during activities of daily living, and pain management. *Id.* at 537, 689. She was discharged from OT with all goals achieved and instruction on a home exercise program. *Id.* at 539. The PT discharge summary states that she was "improved, potential not achieved"; she was using assistive devices to get around and her grandson had moved in. *Id.* at 637. The skilled nursing discharge summary noted insurance limitations, and the PCP's concern that Petitioner needed ongoing care. *Id.* at 179-80; *see also* Ex. 2 at 38. The PCP also assessed Petitioner with fatigue and mild depression potentially caused by her GBS course, although "Petitioner did not think so." Ex. 2 at 36-37.

There are no medical records from early February 2020 until June 24, 2020, when Petitioner returned to her PCP with complaints of "increased weakness and coordination since she stopped having home PT due to COVID outbreak." Ex. 2 at 58. The PCP referred back to the home health service. *Id.*; Ex. 4 at 279-86.

---

[9] Petitioner recalls that her treating providers were pessimistic about her prognosis "due to [her] age," the inpatient therapy was "excruciating," and that regaining feeling in her extremities involved "unbearable pain." Ex. 25 at ¶ 11.

[10] Cited in Resp. Brief at 5.

[11] *But see* Ex. 2 at 56, 57, 60 (primary care records reflecting use of acetaminophen-hydrocodone for pre-existing elbow pain).

A July 23, 2020, home health reevaluation determined that Petitioner should receive skilled nursing care once a week for nine weeks, plus PT. Ex. 4 at 241-42. On July 29th, her PCP recorded that she was feeling well overall, without any complaints obviously attributable to GBS, but she was taking Xanax due to unrelated life stressors. Ex. 2 at 56. She underwent PT on July 29th and 31st. Ex. 4 at 269-70, 273-76. She cancelled PT sessions due to symptoms potentially representing COVID-19 on August 5th and 7th. *Id.* at 266-67. On or around August 12th, she self-discharged from skilled nursing and PT. *Id.* at 265. On August 28th, Petitioner told her PCP that she was feeling well and she had "cancelled PT due to their inconsistency in showing up," Ex. 2 at 57, but that is not evident from the home health records. Subsequent medical records do not document complaints, exam findings, or treatment regarding GBS. *Id.* at 57-76.[12]

## IV. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that Ms. O'Donnell was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of her injury.

To summarize the aforementioned evidence, after Ms. O'Donnell's October 2019 vaccination and GBS onset, she spent thirty-five (35) days hospitalized, which course included repeated imaging; steroids, prescription pain medication; anesthesia and spinal surgery, which did not relieve any complaints (either chronic or new); a lumbar puncture; an eventual GBS diagnosis confirmed via electrodiagnostic testing and treated with five plasmapheresis sessions. She then spent twenty-two (22) days in inpatient rehabilitation for PT, OT, speech therapy, and counseling for depression attributed with her GBS.

Respondent observes record statements that Petitioner felt "nearly back to her baseline" around discharge from in-patient rehab, two months into the GBS course. Resp. Brief at 5, 8,9; Resp. Response at 2. But the concurrent authorization of home health care, and the deficits noted therein, indicate an ongoing, severe course. She received home-based skilled nursing, PT, and OT for an additional three months, which was then interrupted by insurance limitations and the Pandemic. There is some medical record evidence that Petitioner's GBS recovery suffered as a result – but after just three additional home health visits, she self-discharged in August 2020 and did not seek any further care. Overall, the medical record evidence establishes GBS residuals and an

[12] As of April 2023, Petitioner avers that she remains dependent on her grandson to help with most facets of daily life. Ex. 25 at ¶ 20. She describes pain in her feet and legs; weakness and tingling in her feet; difficulty walking; and risk of falling. *Id.* at ¶ 21. She does not address the lack of medical documentation and treatment for these issues; whether any issues (e.g., in her feet) were present before her vaccination and GBS; or whether she ever resumed working as a hairdresser.

active treatment course lasting ten months, without a compelling explanation for the lack of further complaints, and a lack of clarity about the alleged residual symptoms (which could be attributable to either GBS or Petitioner's documented pre-existing conditions).

Respondent proffers a past pain and suffering award of $140,000.00.[13] But his cited cases are inapt. *Schenck*, *Nelson*, *Weil*, and *Shankar* all featured more prompt diagnosis and initiation of treatment; fewer days in hospital and in-patient rehabilitation; and less out-patient care focused on GBS. Respondent also avers that the *Nelson* petitioner "underwent a spinal surgery during GBS treatment." Resp. Brief at 11. But the *Nelson* decision actually reflects a substantial recovery from GBS, and then *over one year post-GBS onset*, a spinal surgery which improved chronic neck and arm pain. 2021 WL 754856, at *2-3. In contrast, Ms. O'Donnell underwent *unnecessary* surgery during her *initial* GBS hospitalization – reflecting misguided treatment efforts that did not get at the heart of the problem.[14]

Petitioner seeks a higher award of $210,000.00.[15] She avers that *Creely* is factually similar, especially for involving an intervening surgery. Pet. Brief at 12 and n. 2. But Petitioner correctly seeks a lower award than in *Creely* in recognition that her GBS course was otherwise less severe.

[13] Citing *Nelson v. Sec'y of Health & Hum Servs.*, No. 17-1747V, 2021 WL 754856 (Fed. Cl. Spec. Mstr. Jan. 13, 2021) ($155,000.00); *Schenck v. Sec'y of Health & Hum Servs.*, No. 21-1768V, 2023 WL 2534594 (Fed. Cl. Spec. Mstr. Feb. 10, 2023) ($150,000.00); *Turner v. Sec'y of Health & Hum Servs.*, No. 19-1051V, 2021 WL 3834198 (Fed. Cl. Spec. Mstr. July 27, 2021) ($150,000.00); *Weil v. Sec'y of Health & Hum Servs.*, No. 21-0831V, 2023 WL 1778281 (Fed. Cl. Spec. Mstr. Jan. 6, 2021) ($140,000.00); *Shankar v. Sec'y of Health & Hum Servs.*, No. 19-1382V, 2022 WL 2196407 (Fed. Cl. Spec. Mstr. May 5, 2022) ($135,000.00).

[14] Respondent also avers that the *Nelson* petitioner "continued out-patient PT for sixteen months after vaccination." Resp. Brief at 11. But the *Nelson* decision actually indicates just two months of out-patient PT (November 2016 – January 2017), then discharge to a home exercise program. 2021 WL 754856, at *3.

[15] Citing *Creely v. Sec'y of Health & Hum Servs.*, No. 18-1434V, 2022 WL 1863921 (Fed. Cl. Spec. Mstr. Apr. 27, 2022) (awarding $250,000.00 for past pain and suffering); *Elenteny v. Sec'y of Health & Hum Servs.*, No. 19-1972V, 2023 WL 2447498 (Fed. Cl. Spec. Mstr. March 10, 2023) ($180,000.00); *McCray v. Sec'y of Health & Hum Servs.*, No. 19-0277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021) ($180,000.00); *Devlin v. Sec'y of Health & Hum Servs.*, No. 19-0191V, 2020 WL 5512505 (Fed. Cl. Spec. Mstr. Aug. 7, 2020) ($180,000.00); *Cegielski v. Sec'y of Health & Hum Servs.*, No. 17-0570V, 2021 WL 1440205 (Fed. Cl. Spec. Mstr. March 16, 2021) ($180,000.00); *Johnson v. Sec'y of Health & Hum Servs.*, No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) ($180,000.00); *Fedewa v. Sec'y of Health & Hum Servs.*, No. 17-1808V, 202 WL1915138 (Fed. Cl. Spec. Mstr. March 26, 2020) ($180,000.00).

Compared to the petitioners in *Elenteny*, *McCray*, *Devlin*, *Cegielski*, *Johnson*, and *Fedewa*, Petitioner spent more days in the hospital and in-patient rehabilitation. Pet. Brief at 14. However, most of those petitioners were able to establish the existence of residual effects for *several years*, via ongoing medical care and/or supporting witness affidavits. *See* Response at 2-4.[16] Petitioner has not provided such evidence. This is particularly important in light of her age and preexisting anemia, COPD, intermittent fatigue, chronic sensory symptoms in her feet, and elbow pain – which might explain her current condition.

A more similar case is *Nyhuis*[17] - featuring a petitioner in his 70s, employed, and with some preexisting medical conditions. 2023 WL 2474326, at *3. The *Nyhuis* petitioner also suffered through a delayed GBS diagnosis[18] and other particularly traumatic events during his hospitalization, and he received home health services for several months. *Id.* at 4. He was assessed with a good recovery from GBS after less than a year, and his treating neurologist observed that some of his ongoing complaints could be attributed to other causes. *Id.*[19] I also find similarity to *Wilson*, in which the petitioner experienced a "truly acute" initial injury, but "his overall course was fairly reasonable for GBS cases" with only about 10 months of formal treatment and no follow-up care for GBS. 2021 WL 5143925 at *4-5.

From those cases, an upward adjustment is warranted because during her initial hospitalization, Petitioner agreed to undergo cervical spine surgery under anesthesia – which was obviously invasive, and carried risks including "death, stroke, paralysis, weakness [and…] infection." Ex. 3 at 377. This surgery was unsuccessful in alleviating any of her symptoms which in fact represented GBS. Therefore, I find that a reasonable past pain and suffering award is $190,000.00.

---

[16] One exception is *Cegielski*, in which the GBS active treatment course was less than a year and her later report of recurrent paresthesias and numbness was not credited. 2021 WL 1440205, at *5. But the decision to award $180,000.00 credited that the *Cegielski* petitioner's GBS prolonged her recovery from a later shoulder surgery. *Id.*

[17] *Nyhuis v. Sec'y of Health & Hum Servs.*, No. 21-1615V, 2023 WL 2474326 (Fed. Cl. Spec. Mstr. Feb. 10, 2023) ($170,000.00).

[18] Delayed diagnosis is unfortunately not uncommon in GBS cases. *See also Elenteny*, 2023 WL 2447498, at *2 (noting several out-patient encounters and five days of testing in the hospital to diagnose GBS); *Devlin*, 2020 WL 5512505, at *3 (noting an inconclusive neurology evaluation and ER encounter before the eventual hospitalization, and ongoing anxiety about his condition and its cause).

[19] *Wilson v. Sec'y of Health & Hum Servs.*, No. 20-0588V, 2021 WL 5143925 (Fed. Cl. Spec. Mstr. Oct. 5, 2021) ($175,000.00).

## Conclusion

Consistent with the above, I award Petitioner a lump sum payment of **$190,000.00 (representing actual pain and suffering).** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[20]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

[20] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.